UNITED STATES *v.* AMERMAN & PATTERSON ET AL. (No. 1977).[1]

1. CONSTRUCTION, PARAGRAPH 15, TARIFF ACT OF 1913—"SUITABLE FOR MEDICINAL OR TOILET PURPOSES."

"A thing to be suitable, as that term is commonly understood, must be fit and appropriate for the end to which it is to be devoted. In the tariff law the term 'suitable' means actually, practically, and commercially fit."—Kahlen *v.* United States (2 Ct. Cust. Appls., 206; T. D. 31947). The provision of paragraph 15, tariff act of 1913, "chalk, precipitated, suitable for medicinal or toilet purposes," will be so construed.

2. CONSTRUCTION—DOUBT FAVORS IMPORTERS.

It is a well-established rule that the importer should prevail if the case in all other respects stands at an even balance.

3. "CHALK," PARAGRAPHS 15 AND 16, TARIFF ACT OF 1913.

Chalk which had been precipitated from municipal water in order to make the water fit for use was imported. While it was shown to meet the requirements of the United States Pharmacopœia for use as a medicine and to be capable of use in tooth powder, it was also shown that it was bolted in this country to separate it from impurities before being so used and to be quite largely devoted to uses other than medicinal and toilet. It should not be regarded as "suitable for medicinal or toilet purposes" under paragraph 15, tariff act of 1913; and the decision of the Board of United States General Appraisers classifying it as "chalk, ground or bolted," under paragraph 60 is affirmed.

United States Court of Customs Appeals, November 25, 1919.

APPEAL from Board of United States General Appraisers, Abstract 43005.

[Affirmed.]

*Bert Hanson,* Assistant Attorney General (*Harry M. Farrell,* special attorney, of counsel), for the United States.
*Walter F. Welch* for appellees.

---

[1] T. D. 38205 (37 Treas. Dec., 237).

[Oral argument Oct. 8, 1919, by Mr. Hanson and Mr. Welch.]

Before MONTGOMERY, SMITH, BARBER, and MARTIN, Judges.

MARTIN, Judge, delivered the opinion of the court:

The merchandise in this case is chalk in the form of a fine powder, imported under the tariff act of 1913. It was assessed with duty at the rate of 25 per cent ad valorem under the provision for "chalk, precipitated, suitable for medicinal or toilet purposes," contained in paragraph 15 of the act.

The importers protested, claiming assessment at the rate of one-tenth of a cent per pound, under the provision for "chalk, ground or bolted," contained in paragraph 60 of the same act.

The protest was sustained by the Board of General Appraisers and the Government appeals from this decision. The question, therefore, is whether the imported chalk is dutiable simply as "chalk, ground or bolted," or is dutiable at a higher rate as "chalk, precipitated, suitable for medicinal or toilet purposes." The record of course contains the testimony upon which the board's decision of the question was rested.

The paragraphs in question read as follows:

15. Chalk, precipitated, suitable for medicinal or toilet purposes· chalk put up in the form of cubes, blocks, sticks, or disks, or otherwise, including tailors', billiard, red, and other manufactures of chalk not specially provided for in this section, 25 per centum ad valorem.

60. Whiting and Paris white, dry, and chalk, ground or bolted, $\frac{1}{10}$ cent per pound; whiting and Paris white, ground in oil, or putty, 15 per centum ad valorem.

It appears that in certain parts of England the water supply for various cities is obtained by driving wells of a sufficient depth to reach the fissures in the chalk deposits which underlie the soil there. The wells go to a depth of about 600 feet, and the water must be pumped to the surface. The water thus procured is so densely saturated with lime that it must be treated before it becomes fit for municipal use. Accordingly, it is first pumped into large precipitating basins, where it is mixed with chemical reagents and agitated with compressed air. After a period of 24 to 48 hours the lime in the water and the reagent as well drop to the bottom in the form of a white precipitate of chalk. This covers the floor of the basin to a depth of perhaps 6 inches. The water is then drawn off for municipal use. Afterwards the creamy mass of precipitate is removed from the basins and dumped upon near-by piles, which accumulate "as the culm does outside of a coal dump in Pennsylvania." This process is, of course, continued incessantly. If there is a market for the precipitate, the quantity desired is taken from the dumps and dried; it is then bolted and packed in casks or bags for shipment; and this is the material, concededly, which is the merchandise now in question. It does not appear that it has been subjected to any process

before exportation in order to fit or prepare it peculiarly for medicinal or toilet purposes.

The decisive question in the present case is whether the chalk thus described is, when imported into this country, suitable for medicinal or toilet purposes. The term "suitable for" has been defined by this court as follows:

A thing to be suitable, as that term is commonly understood, must be fit and appropriate for the end to which it is to be devoted. In the tariff law the term "suitable" means actually, practically, and commercially fit. Kahlen v. United States (2 Ct. Cust. Appls., 206, 208; T. D. 31947).

The present question, therefore, is whether the imported chalk at importation is actually, practically, and commercially fit for use for medicinal or toilet purposes. This question, of course, is not presented to the court as an original issue, for the board has already found upon the testimony against the claim made by the appellant, and we are called upon to say whether that finding is unsustained by the evidence in the record.

It does not seem necessary for us to review the testimony in detail in this decision. It appears from the record that the imported chalk when chemically analyzed generally responds when imported to the requirements of the United States Pharmacopœia for use as a medicine, and, furthermore, that it may when imported be used as a tooth powder, which concededly is a toilet purpose. But, on the other hand, it may fairly be understood from the testimony that in this country it is not generally accepted by the trade or the public in its condition at importation as "actually, practically, and commercially fit" for use as a medicine or tooth powder. It is rather regarded commonly and commercially as a raw material from which medicinal and toilet preparations may be produced, but which may likewise be used as imported in various other arts and industries.

It is said by one of the witnesses, Walter E. Rowley, that his establishment imports the present article in quantities of from 50 to 500 casks at a time for sale all over the country; that it is sold primarily to manufacturers of tooth powder and toilet preparations, but that it is also sold quite largely to paper manufacturers, rubber manufacturers, lithograph people, and metal-polishing people. Also to some paint manufacturers, and to oil and grease people. It is also sold for fireworks. The witness stated that there was absolutely nothing about the chalk in its condition as imported to indicate which one of the foregoing uses it was to be devoted to and that it could be used indiscriminately for any one of them. We understand the witness to mean by this statement that the chalk as imported may go into any one of these various manufactures for such use as it may be put to therein.

It is said by another witness, Ralph Lyon, that his company buys large quantities of the imported article for use in making tooth pow-

ders; that the article as imported would not be suitable for use as a tooth powder, but must first be bolted through a very fine bolting silk in order to remove not only such impurities as are incident to its packing and transportation to this country, but also impurities which are in the chalk when exported, such as coal dust, which settles upon it while lying upon the dumps. The witness said that his firm recovered many barrels of coal dust from the chalk bolted by them every year.

The testimony is not free from serious contradictions, but it sufficiently sustains the view that practically and as a general commercial rule the imported chalk after importation must be carefully bolted and otherwise treated before it becomes a trade article fit or adapted for medicinal or toilet use. This fact affects not merely the quality of the merchandise but also its classification for duty, and sustains the view expressed in the decision of the board.

This conclusion is supported by the decision of the Circuit Court of Appeals in the case of United States *v.* Anderson & Co. (175 Fed., 961), a case relating to precisely similar merchandise. The case arose under the tariff act of 1897, which, however, employed the phrase "prepared for toilet purposes," instead of "suitable for toilet purposes." While this difference of phraseology somewhat affects the value of the decision as an authority, yet it does not entirely destroy it. In the decision the court said in part:

> Now, after a careful examination of the evidence, we find nothing to warrant a finding that this merchandise has been prepared for toilet purposes. The preparation which it has gone through has been only such as has been necessary to prepare precipitated chalk for the market to be used for any purpose. We can not think that bolting and packing precipitated chalk in bags prepares it for toilet purposes within the meaning of the statute. While the preparation referred to is not, perhaps, such as is necessary to make a completed toilet article, we think the bagged and bolted precipitated chalk must in some degree be advanced toward use for toilet purposes, by the admixture of flavoring or other ingredients or otherwise, before it comes within the exception of the act.

It may be noted incidentally that in the intervening tariff act of 1909 no qualification of this kind appeared in the corresponding chalk provisions. It may also be noted that the present case differs from that of the Swedish Iron & Steel Corporation *v.* United States (6 Ct. Cust. Appls., 225; T. D. 35466) in the decisive particular that in this case the treatment of the imported merchandise in order to make it suitable for its prescribed use is not made necessary by the unavoidable incidents of transportation alone but by the condition of the merchandise at exportation as well.

The foregoing reasons, in the light especially of the well-established rule that the importers should prevail if the case in all other respects stands at an even balance, lead to an affirmance of the board's decision.

*Affirmed.*