(C.D. 3918)

J. M. ALTIERI ET AL. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided November 10, 1969)

*Robert N. Altman*, for plaintiff, J. M. Altieri, with *Siegel, Mandell & Davidson*, associate counsel; *Siegel, Mandell & Davidson*, for plaintiff, Rafael Ferran Martinez, a/c La Electronica, Inc. (*Joshua M. Davidson* and *Harvey A. Isaacs* of counsel).

*William D. Ruckelshaus*, Assistant Attorney General (*Andrew P. Vance* and *Peter Jay Baskin*, trial attorneys), for the defendant.

Before RAO, FORD, and NEWMAN, Judges

NEWMAN, Judge: In these three consolidated cases, plaintiffs have protested the tariff classification by the collector of customs (now district director) of certain galvanized continuous weld lightweight pipe imported at San Juan, Puerto Rico. The merchandise was assessed with duty at the rate of 12½ per centum ad valorem under the provision in paragraph 328 of the Tariff Act of 1930, as modified by T.D. 54108, for "[r]igid iron or steel tubes or pipes prepared and lined or coated in any manner suitable for use as conduits for electrical conductors."

Plaintiffs claim that the merchandise is not suitable for use as electrical conduit, and is properly dutiable at the rate of 0.3 cent per pound under the following provision in paragraph 328, as modified, supra:

> * * * butt-welded * * * iron or steel tubes, pipes * * * not thinner than 0.065 inch, and not less than ⅜ inch in diameter * * *.

## The Issue

At the trial, Government counsel conceded the correctness of plaintiffs' claim in the event that the collector's classification was proven to be erroneous (R. 3–4). Hence, the sole issue for our determination is: have plaintiffs sustained their burden of establishing that the imported pipe was not suitable for use as electrical conduit? For the reasons expressed herein, we hold that plaintiffs have met their burden of proof, and accordingly the protests are sustained.

## The Record

At the trial, plaintiffs presented the testimony of two witnesses, while defendant called six witnesses on its behalf.

Plaintiffs' witnesses were: Antonio Fuentes, general manager of International Agencies, Inc., wholesaler and manufacturers' agent for various construction materials, and one of the plaintiffs. Mr. Fuentes had been general manager for twelve years, but his experience in construction materials covered a period of fully thirty-five years.

Herman J. Cestero, a former civil engineer for the Puerto Rico Water Resources Authority over a period of twenty years, and at the time of trial an independent civil engineer for two years. Puerto Rico Water Resources Authority is a public corporation, responsible for the approval and inspection of electrical installations in new construction in Puerto Rico.

Defendant's witnesses were:

Ruben D. Reyes, an electrical engineer for twenty-four years and a contractor engaged in electrical equipment sales and installations in Puerto Rico for thirteen years;

Rafael Cofino, for twenty-eight years a dispatcher and salesman for Abarco Warehouse, seller of pipes, fittings, and other equipment;

Jose E. Muniz, for thirty years a store manager for Sole Electric Contractors, Inc., a retail and wholesale supplier of various electrical materials;

Angel Ginorio, an electrical engineer for four years, and employed for seven months as a purchasing agent by Sole Electric Construction, Inc.;

Pedro Acevedo, assistant district director of customs and former appraiser of merchandise;

Bartolome M. Munoz Mayol, a mechanical engineer for almost forty years, and manager for seventeen years of Marina Electrical Supplies, Inc., a seller of various electrical materials; and a former engineer for Puerto Rico Water Resources Authority (1930–1951), serving thirteen years as head of the division in charge of electric power transmission and generation.

The parties introduced in evidence the following exhibits:

Plaintiffs' exhibit 1 is a piece or cutting from a common light-weight gas or water pipe, butt-welded and galvanized, threaded at one end, with a coupling tightly screwed on almost one-half of the length of the threads. This exhibit is not representative of the imported merchandise, but is illustrative of the operation of the coupling on the threads to make a watertight joint.[1]

Plaintiffs' illustrative exhibit 2 is a half-inch electric conduit ninety degree elbow, threaded at both ends, with a coupling screwed on the entire length of the threads at one end. This exhibit illustrates the proper bending of an electrical conduit pipe (R.21), and the operation of a coupling on electrical conduit (R.22–23).

Plaintiffs' collective exhibit 3 consists of two short pieces of pipe, rodded and reamed, one pipe inserted into the other, illustrative of the use of such pipes as an axle and bushing to perform a mechanical function (R.27).

Defendant's exhibit A is, by agreement of the parties, a sample of the merchandise in entry 6298, covered by protest 63/20651, differing from its condition as imported in the following respects: the sample piece of pipe is eighteen inches long, having been cut from the original ten foot length of pipe. It has a "slight bend" (R.66), having been subjected to a bending test by the customs laboratory in Puerto Rico; and it lacks the coupling which was on the threaded end of the pipe when imported. The sample is three-quarter inch continuous weld lightweight pipe, rodded and reamed.[2]

Defendant's exhibit B is a set of wires used by witness Reyes to demonstrate how wires pass through exhibit A.

Before considering the testimony, it is appropriate, initially, to set forth a summary of the contentions of the respective parties.

Plaintiffs contend that the evidence establishes that there are several prerequisites which make pipe suitable for use as electrical conduit. These prerequisites are: (1) the pipe must be rodded and reamed; (2) it must have straight or parallel threads and a proper coupling to allow a flush joint; (3) it must be sufficiently ductile so that, when

---

[1] At the trial, defendant objected to the admission in evidence of this exhibit as not being representative of the imported merchandise, and the trial judge received it with the qualified understanding that it be considered as illustrative. Now, in its brief, defendant has again interposed the same objection to exhibit 1 made at the trial for a ruling by the full division of this court.

It appears that exhibit 1 is not rodded and reamed and was imported in lengths of twenty feet, while the involved pipe was rodded and reamed and imported in lengths of ten feet. However, exhibit 1 resembles the pipe in issue to the extent that both have tapered threads and a coupling. As noted later, the coupling is missing from defendant's exhibit A. Under these circumstances it was entirely appropriate for the trial judge to receive exhibit 1 in evidence with the qualification that it was to be considered as illustrative. Hence, the defendant's present objection to exhibit 1 is overruled.

[2] "Rodding" removes any burrs on the inside of the pipe which result from the welding process, while "reaming" removes burrs at the ends of the pipe. (R. 25, 45, 46.)

bent, the inside diameter is not changed; and (4) the pipe must have affixed thereto an Underwriters' Laboratories label to be lawfully used in Puerto Rico and the United States. Plaintiffs concede that the imported pipe was rodded and reamed, but insist that items (2), (3), and (4), *supra*, were lacking, thereby making the pipe unsuitable for use as electrical conduit.

Defendant argues that plaintiffs have failed to carry their burden of proof, inasmuch as the weight of the evidence establishes that the merchandise, of which exhibit A is a sample, is suitable for use as conduits for electrical conductors.

With this background, we now consider the record, with emphasis upon items (2), (3), and (4), *supra.*

### Threads and Coupling

While plaintiffs' witnesses testified, without contradiction, that the threads on exhibits A and 1 are tapered, there is substantial disagreement between plaintiffs' and defendant's witnesses respecting the significance of the tapered threads.

In substance, plaintiffs' witnesses testified as follows:

Since exhibits A and 1 have tapered threads, it is impossible to have a flush joinder of the pipes inside the coupling, which has straight or parallel threads. The purpose of tapered threads on water pipe such as exhibits A and 1 is that the coupling (or connection between the pipes) can be made watertight with a wrench; whereas in electrical conduit the coupling need not be watertight and the threads should be straight (parallel), so that the couplings can be tightened on the pipe without a wrench (viz., with the fingers).

The tapered threads on exhibits A and 1 prevent the connecting pipes from going far enough into the coupling to meet each other to form a flush union, and the two pipes would be separated by at least three-eights of an inch. Such separation would prevent the electric wires from passing through the pipes without abrasion of the insulation or snagging of the wires at the ends of the pipes (which would likely cause a short circuit). For that reason alone, the tapered threads on exhibits A and 1 make the pipes unsuitable for use as electrical conduit.

Defendant's witnesses Reyes, Ginorio, and Munoz conceded that without a flush joinder, the pipes would not be suitable for use as electrical conduit. However, Reyes stated that it is "possible" to have a flush joinder in exhibit A by using wrenches (R. 87–88). Nevertheless, Munoz testified that "normally" electric conduit coupling was put on "by hand," whereas a wrench was used to tighten coupling on water pipe where there is 125 pounds of pressure (R.124). Munoz also gave

his opinion that exhibit A is suitable for use as electrical conduit since (among other reasons) it has short threads which go further inside the coupling, thus resulting in a flush joinder. Ginorio, however, testified that, by looking at exhibit A, he could not determine whether it could make a flush joinder.

## Bending Capability

The record clearly establishes that electrical conduit, such as exhibit 2, is sufficiently ductile so that it may be bent without changing its inside diameter. Although plaintiffs' witnesses, admittedly, had not performed any bending test on exhibit A, it was their opinion that such pipe was too rigid and lacked sufficient bending facility for use as electrical conduit.

It appears from Acevedo's testimony that, in the course of considering the advisory classification and appraisement of the merchandise, exhibit A was submitted by him to the customs laboratory for a bending test. An examination of exhibit A shows that although it has been slightly bent, a portion of the pipe is flattened (or mashed in), apparently from the blows of a hammer or other tool. Mr. Acevedo stated "for the record" that the laboratory personnel did not use "appropriate" tools to perform the test, but on cross-examination, expressed complete unfamiliarity with the "appropriate" tools (R. 116–117). Acevedo also testified that another piece of the imported pipe had been bent into a semicircular shape, but no such sample was introduced in evidence to show its condition after bending. Moreover, no witnesses from the customs laboratory, which supervised the bending test, were called by defendant.

## Underwriters' Laboratories Label

It is undisputed that there was no label of the Underwriters' Laboratories affixed to the imported pipe at the time of importation. Plaintiffs' witnesses and defendant's witness Munoz testified, in substance, that such label was a prerequisite for the lawful and proper use of electrical conduit in Puerto Rico under the regulations of the Puerto Rico Water Resources Authority. Cestero also testified that the National Electrical Code requires certification of materials by the Underwriters' Laboratories, and that all electrical installations must have an Underwriters' label on the material before it may be legally installed.

Defendant's witness Reyes disagreed with the testimony of plaintiffs' witnesses. He stated that an Underwriters' label was not required in Puerto Rico on imported materials used in electrical installations (except those meeting Federal Specifications); and moreover he had

used electrical conduit pipe in installations in Puerto Rico which did not have an Underwriters' label affixed to it.

## The Law

The issue in this case of suitability for use is essentially one of fact, and there is the usual presumption of correctness in favor of the collector's finding, *Mamluck & Co. et al.* v. *United States*, 6 Ct. Cust. Appls. 556, T.D. 36198 (1916). Thus, in view of the limitation of the issue to the correctness of the classification, by stipulation of the parties, plaintiffs' burden of proof in the instant case was solely one of establishing a negative fact, to wit: that the imported tubes were not suitable for use as conduits for electrical conductors. Cf. *Stone & Downer Co. et al.* v. *United States*, 4 Ct. Cust. Appls. 47, T. D. 33266 (1913).

The construction of the phrase "suitable for use" in tariff statutes is well settled and is not disputed by either party. *Keer, Maurer Company* v. *United States*, 46 CCPA 110, C.A.D. 710 (1959), cited in the briefs of both parties, concisely states the applicable rules, as follows (*id.* at 114) :

> The words "suitable for use," as applied in the Customs law mean "actually, practically, and commercially fit" for such use. *Kahlen* v. *United States*, 2 Ct. Cust. Appls. 206, T.D. 31947; *United States* v. *Lorsch & Co.*, 8 Ct. Cust. Appls. 109, T.D. 37222; *United States* v. *Amerman & Patterson et al.*, 9 Ct. Cust. Appls. 244, T.D. 38205; *United States* v. *Geo S. Bush & Co., Inc., et al.*, 26 CCPA 145, C.A.D. 8; *Coro, Inc.* v. *United States*, 41 CCPA 215, C.A.D. 554. Such suitability does not require that the merchandise be chiefly used for the stated purpose, *United States* v. *Lorsch & Co.*, supra, but it does require more than "* * * evidence of a casual, incidental, exceptional, or possible use. * * *" *Kahlen* v. *United States*, supra. There must be a substantial actual use, *Wah Shang Company* v. *United States*, 44 CCPA 155, C.A.D. 654.

Consequently, in the light of well-settled law, plaintiffs had the burden of establishing by a preponderance of the evidence that the imported pipe was not "actually, practically, and commercially fit" to be used as electrical conduit.

## Findings and Conclusions

We find that the testimony of plaintiffs' witnesses was clear and convincing to the effect that the imported pipe was unsuitable for use as electrical conduit. Indeed, defendant's trade and professional witnesses, although well qualified to testify concerning the merchandise in issue, contradicted one another on material points; and their testi-

mony appears to substantiate, to a large degree, the position of plaintiffs. The court finds, therefore, that plaintiffs' proofs are sufficient to establish a *prima facie* case which overcomes the presumption of correctness attaching to the collector's classification; and that defendant's evidence fails to satisfactorily rebut that presented by plaintiffs.[3]

There is substantial evidence in the record that the threads on exhibit A are tapered (as opposed to parallel), and that the tapered threads would prevent a flush joinder of the pipes inside the coupling (which has straight or parallel threads). By contrast, plaintiffs' illustrative exhibit 2 shows that a coupling on electrical conduit will screw completely on the pipe threads with the use of merely finger pressure, thus permitting a flush joinder of the conduit pipes. Although the use of wrenches for tightening water pipe coupling is the normal practice, conduit coupling is generally tightened by hand since the threads on the pipe are parallel (or nearly so) and a watertight connection is not essential. That it would be "possible" in exhibit A to have a flush joinder with use of wrenches, does not make the pipe actually, practically, and commercially fit for use as electrical conduit.

Furthermore, in the absence of the coupling with which exhibit A was imported, we are inclined to give little weight to the testimony of Mr. Munoz (on redirect examination) that the short threads on exhibit A would permit a flush joinder. Munoz was defendant's sixth witness, and although defendant's prior trade witnesses (except Cofino) were questioned extensively on cross-examination concerning the threads and coupling on exhibit A, none of them mentioned that point.

Accordingly, we find that due to its tapered threads the instant pipe would not make a flush coupling, and for that reason alone it would not be actually, practically, and commercially fit for use as electrical conduit.

An additional factor, which is persuasive that the instant pipe is not actually, practically, and commercially fit for use as electrical conduit, is that it lacks the required bending capability, as testified by plaintiffs' witnesses. The importance of bending capability, as a prerequisite for the use of the imported pipe as electrical conduit, was obviously recognized by the customs officials. Presumably, this is why Mr. Acevedo sent a sample of the imported pipe to the customs laboratory for a bending test when he was considering the advisory classification of the merchandise. Exhibit A, which is the only sample of the imported pipe in evidence, is a potent witness negating its bending capability. The court can give little weight to Acevedo's

---

[3] In view of plaintiffs' *prima facie* case, the burden of going forward with proof in support of the classification shifted to defendant. *United States* v. *Wanamaker,* 14 Ct. Cust. Appls. 285, T.D. 41888 (1926) ; *Kubie & Co.* v. *United States,* 12 Ct. Cust. Appls. 468, T.D. 40668 (1925).

testimony that the laboratory personnel did not use "appropriate" tools in making the test, since he expressed complete unfamiliarity with the appropriate tools. Moreover, there was no testimony by the laboratory personnel that they performed the bending test improperly, or otherwise did not make a reasonable effort to bend exhibit A.

Further, the court can attach little weight to Mr. Acevedo's testimony that a piece of the imported pipe had been bent to a semicircular shape, in the absence of a sample or anything in the record to show that the inside diameter of the pipe was not changed, or to otherwise indicate the condition of the pipe after such bending.

Additionally, some observations concerning defendant's case in rebuttal are worthy of mention. It would undoubtedly be *possible* to use exhibit A as a conduit for electric wires inasmuch as wires can pass through the pipe, as demonstrated in court by defendant's witness Reyes (R.76). Again, it may be a fact that pipe such as exhibit A had been used in Puerto Rico as a conduit for electric wires in certain instances, and the court does not question the credibility of Mr. Reyes who stated that such pipe had been so used. However, from the foregoing we may not conclude that the pipe was suitable for use as electrical conduit. As was noted in the landmark decision of *Kahlen* v. *United States*, 2 Ct. Cust. Appls, 206, 208, T.D. 31947 (1911) :

> * * * From the fact that a thing may be used or has been used for a particular end it does not necessarily follow that it is commercially suitable therefor, and evidence of a casual, incidental, exceptional, or possible use of a thing can not be accepted as proof of its suitability for such use. A house may be built of ice or of paper, but in this country at least such materials would hardly be regarded as suitable building materials. A thing to be suitable, as that term is commonly understood, must be fit and appropriate for the end to which it is to be devoted. * * *

Defendant contends that the testimony of its witnesses Reyes and Munoz establishes the "substantial actual use" that was called for in *Wah Shang Company* v. *United States*, 44 CCPA 155, C.A.D. 654 (1957). We do not agree. Not one of defendant's witnesses, including Mr. Reyes, who was responsible for the installation of millions of dollars worth of electrical systems in Puerto Rico, was able to testify that he had ever inventoried, sold, or used pipe such as exhibit A as electrical conduit. In point of fact, defendant's witness Muniz specifically testified that he did not sell pipe like exhibit A for electrical purposes, except to ground an electric wire. Additionally, it is very significant that defendant's witness Munoz—a graduate mechanical engineer, a manager of an electrical supply firm for approximately seventeen years, and a longtime professional engineer with the Puerto Rico Water Resources Authority (since 1930) dealing with electrical

transmission—had no knowledge concerning the commercial use of exhibit A in Puerto Rico (R. 138). It is reasonable to assume that if pipe such as exhibit A was inventoried and sold as electrical conduit, defendant would have put abundant evidence of this fact on the record, considering that four of its six witnesses were employed by firms engaged in the sale of electrical materials. Since defendant did not do so, we can only infer that the fact was to the contrary.

We also point out that plaintiffs' witness Fuentes testified that he sold the imported merchandise as water or gas pipe. It is a reasonable inference that if there had been any significant market in Puerto Rico for the instant pipe as electrical conduit, Mr. Fuentes would undoubtedly have promoted and sold the pipes for such use. Importers of merchandise have every incentive for knowing the uses to which their goods are or may be put and it may be assumed, *prima facie*, that the uses known to them are the only uses of such wares. *Klipstein* v. *United States*, 1 Ct. Cust. Appls. 122, T.D. 31120 (1910) ; *Kubie & Co.* v. *United States*, 12 Ct. Cust. Appls. 468, T.D. 40668 (1925).

In view of the foregoing considerations, the court is not inclined to decide the factual issue against the plaintiffs merely on the basis that the imported pipe was rodded and reamed and happened to be the same length as electrical conduit.[4] Mr. Fuentes satisfactorily explained, and without contradiction, that it was more convenient to use the shorter (ten foot) lengths for interior installation in small houses, while the full length (twenty-one foot) water pipe was better for the outside, since it reduced the amount of couplings and unions (R. 33, 45). He also stated that: "rodding and reaming assures a cleaner pipe inside. That takes out all the burrs caused by the welding process" (R. 45).

## Conclusion

It has been shown to the court's satisfaction that two vital characteristics of electrical conduit are absent in the imported pipe; it does not have parallel threads allowing a flush joint inside a coupling, and it does not possess the requisite bending capability. Plainly, then, the record establishes that plaintiffs have met their burden of proof under the requisite guidelines of the *Keer, Maurer Company* and *Kahlen* holdings: the importation is not "suitable for use" in that it is not "actually, practically, and commercially fit" for use as electrical conduit.

The foregoing makes it unnecessary for the court to reach and pass upon plaintiffs' further contention that the instant pipe was unsuitable

---

[4] The record establishes that the standard length of electrical conduit pipe is ten feet, while that of water pipe is twenty-one feet. However, for an extra price, water pipe may be purchased in ten foot lengths, according to witnesses Fuentes and Munoz (R. 31, 48, 121–122, 127).

for use as electrical conduit because it did not contain the Underwriters' Laboratories label.

The protests are sustained and judgment will issue accordingly.